# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 12, 2012

## STATE OF TENNESSEE v. COREY NOLAND

**Appeal from the Criminal Court for Shelby County**
**Nos. 09-00015, 10-04036     James M. Lammey, Jr., Judge**

**No. W2010-02567-CCA-R3-CD  - Filed October 25, 2012**

A Shelby County jury convicted appellant, Corey Noland, of false imprisonment, a Class A misdemeanor; domestic assault, a Class A misdemeanor; bribery of a witness, a Class C felony; two counts of coercion of a witness, Class D felonies; and aggravated stalking, a Class E felony.  The trial court sentenced him to an effective sentence of eighteen years in the Tennessee Department of Correction.  Appellant argues that (1) the evidence was insufficient to support his convictions; (2) the trial court erred in applying sentence enhancement factors; and (3) the trial court erred in allowing the State to engage in "vindictive prosecution."  After reviewing the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JEFFREY S. BIVINS, JJ., joined.

Paul K. Guibao and Matthew S. Lyons (on appeal); Samuel Perkins (at trial), Memphis, Tennessee, for the appellant, Corey Noland.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Kevin Rardin and Stacy McEndree, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. Procedural History

This case arises from an incident involving appellant and the victim that began on the evening of August 31, 2008. Appellant was accused of handcuffing the victim, striking her face, taping her mouth, putting her in the trunk of her car, and driving away. He was later accused of several counts of bribery of a witness and coercion of a witness, along with aggravated stalking.

On January 6, 2009, a Shelby County grand jury indicted appellant in case number 09-00015 for especially aggravated kidnapping, aggravated assault, and domestic assault. On June 17, 2010, a Shelby County grand jury indicted appellant in case number 10-04036 for two counts of bribery of a witness, three counts of coercion of a witness, and one count of aggravated stalking. The court consolidated the cases for trial. After the trial, the jury convicted appellant in case number 09-00015 of domestic assault and false imprisonment, a lesser-included offense of especially aggravated kidnapping. The jury acquitted him of aggravated assault. In case number 10-04036, the jury acquitted appellant of one count of bribery of a witness and one count of coercion of a witness. The jury convicted him of one count of bribery of a witness, two counts of coercion of a witness, and one count of aggravated stalking. The trial court sentenced him to an effective sentence of eighteen years.

## II. Facts

The victim, Jean Alice Nails, testified that appellant was her ex-boyfriend and the father of her two children, Satin Noland and Corey Noland, Jr. ("C.J."). In September of 2008, she, Satin[1], and C.J. lived on Mingle Drive in Memphis, Tennessee. Appellant lived with his sister. She and appellant were not dating then, but they were discussing reconciling.

On the evening of August 31, 2008, appellant went to the victim's home to watch the children while the victim went out with some friends. Rosalyn Murdock, Satin's friend, was also at the home spending the night with Satin. When the victim returned home, appellant was sitting on the couch, and the children were sleeping. Appellant wanted to talk to the victim, but the victim told him she did not feel like talking. The victim went into her bedroom and changed into her nightclothes.

_____

[1] Because several people involved in this case share the surname Noland, we will refer to them by their first names. In doing so, we intend no disrespect.

Appellant went into the victim's bedroom and attempted to talk to her. The victim again told appellant that she did not want to talk. Appellant told her they needed to discuss what would happen with the children if they did not reconcile their relationship. The victim stated that she "could see the argument getting heated," so she jumped out of the bed and told appellant that she did not feel like talking. The victim then grabbed a knife that she kept on her night stand for protection. Appellant asked her, "'What did you grab the knife for? You don't need a knife. I'm just trying to talk to you.'" She told appellant that if he "messed with" her, she would defend herself with the knife. She stated that she did not attempt to stab appellant.

The victim testified that appellant left her bedroom and returned with handcuffs. The victim and appellant continued to argue when he returned. She stated that appellant tried to convince her to put down the knife, but she would not. Appellant then grabbed the victim's arms and put her in the handcuffs. The victim no longer had the knife, and she was hitting appellant attempting to prevent him from handcuffing her. The victim explained that appellant had handcuffs because he was a security officer.

The victim and appellant continued to argue after appellant secured her in the handcuffs. The victim said as their arguing got louder, appellant tried to reassure her that he only wanted to talk. They started to walk down the hallway, and Satin opened her bedroom door and asked them what was happening. The victim answered, "Satin, it's okay. We was [sic] having an argument. Just go back in the room. Don't wake Rosalyn[.]" The victim stated that by this point, appellant had picked up the knife that the victim used to defend herself.

The victim told appellant they should take their argument outside so they would not disturb the sleeping children. Before they went out the door, appellant put black duct tape over the victim's mouth. The victim stated that it was dark outside, and she did not have a porch light, so she fell as she was walking down the steps from her house. The victim said she hit the concrete and "something [was] just running down [her] face and into [her] mouth . . . ." She said she obviously was bleeding. Appellant pulled her up by the handcuffs and placed her into her vehicle. The victim testified that she could not remember in which part of the vehicle appellant placed her. Appellant began driving, and they continued to argue.

The victim said appellant eventually stopped the vehicle after ten to fifteen minutes. She did not know where they were when appellant stopped driving and said they appeared to be at a construction site. Appellant removed the victim from the vehicle and continued trying to talk to her. The victim told appellant to remove the handcuffs, and appellant told her that he did not know where the key was located. As they continued to argue, appellant hit the victim's face with his hand multiple times. The victim said she started to agree with

appellant so he would take her back to her home. She stated that agreeing with appellant did not work initially, but appellant eventually said, "Let's go; you're not worth it." Appellant placed the victim inside the front passenger side of the vehicle and drove her back to her home.

When they arrived at the house, a police officer stopped the vehicle before appellant could pull it into the driveway. The officer unlocked the handcuffs that appellant had placed on the victim. Paramedics also arrived at the victim's home and treated the victim. After she was treated by the paramedics, an officer drove the victim to the police precinct to give a statement.

The victim testified that after the incident, she received several telephone calls from appellant on both her cellular and work telephones. Some telephone calls between the victim and appellant were recorded. The victim said she listened to the recordings and identified her voice and appellant's voice on them. When asked how many calls she received, the victim answered, "It was more than enough." She said appellant often called her several times per day, and it caused problems at her job because she was not supposed to talk on her cell phone while at work. The victim did not get into trouble for appellant's calling while she was at work, but she did not want him to call "just out of respect" for her employer.

The victim had been subpoenaed for appellant's court proceedings. She denied that appellant told her how to handle the subpoenas when he called. She stated that she and appellant occasionally discussed whether she would appear in court. She said she did not remember appellant's telling her what he would do for her if she did as he said and further said appellant could not do anything for her. The victim testified that appellant talked to her about "some of everything" when he called, including their children. They also discussed the night of the incident, but the victim stated she could not remember what appellant said.

The victim did not remember appellant's telling her to not show up at a preliminary hearing. She did not remember if she told the police that she fell while exiting her home on the night of the incident but acknowledged that her statement did not mention it. Likewise, she did not remember whether she told the police that appellant grabbed the knife from her or that he picked it up.

The victim identified a signed copy of her statement and used it to refresh her memory. The victim testified that she told the police that appellant was responsible for kidnapping and assaulting her. She further told the police that she sustained a large knot over her left eye, a bruise under her right eye, and scratches around her neck because of appellant's assault on her. In addition, she admitted telling officers that both of her wrists were sore from the handcuffs appellant placed on her. Her statement recounted how

-4-

appellant handcuffed her, grabbed a kitchen knife, threatened to kill her, put her in the trunk, and drove her to an unknown location. When they stopped, appellant got her out of the trunk, took the tape off her mouth, and started punching her in the face. The victim testified that her statement said she pleaded with appellant and told him what he wanted to hear so he would stop hurting her. In her statement, the victim estimated that she was in the trunk for fifteen to twenty minutes and that appellant hit her at least six times. She told the police that she was in fear for her life during the incident. The victim's statement reflected that appellant had assaulted her twice before this incident.

On cross-examination, the victim testified that she spoke to police immediately after the incident. She agreed she was "pretty upset" when she made the statement. She was angry with appellant and wanted to get far away from him. The victim stated that she told the police what happened to the best of her ability. Although the paramedics examined her, she did not receive any treatment for her injuries before she gave her statement. The victim said she was stressed and had a headache when she gave her statement. She also said she had been drinking on the night of the incident.

The victim testified that she dropped the knife on her bed as appellant was placing her in handcuffs, and appellant picked up the knife. Appellant no longer had the knife when they went outside. The victim did not know what appellant did with the knife once they went outside because he was walking behind her. She said appellant did not "stick" her or threaten to stab her with the knife as they were going outside.

The victim stated that it was her suggestion to leave the house so that they would not disturb the sleeping children with their arguing and that she willingly left the house with appellant. She said appellant told her to get into the vehicle, but she did not remember his threat to kill her. However, she acknowledged that her memory was probably better when she made her statement.

The victim did not remember appellant's telling her that she had no reason to fear him and that he was going to move away and not bother her anymore. The victim testified that she was not afraid of appellant although he would sometimes get violent. She stated that if appellant wanted to see their children she would allow it, but she would not allow him inside her home.

According to the victim, appellant was anxious for her to help him. The victim "put up [her] house" so appellant could make bond after he was arrested. She said she did so because she wanted him released for the benefit of their children. The victim told the police that she did not want to prosecute appellant and that she and appellant could handle the

-5-

situation themselves. The victim stated that she was only in court testifying because the State subpoenaed her. The victim said she was testifying truthfully.

Regarding appellant's telephone calls, the victim testified that during their relationship, she often received two telephone calls a day from appellant. The victim said after the incident, she "really didn't want to talk to [appellant] some days[.]" However, if appellant called about their children, she did not have a problem with his calls. She agreed that appellant often talked about the children when he called. Appellant also brought up the incident, which she did not want to discuss. She testified that the telephone calls were harassing to her when he wanted to talk about the trial, and she did not want to discuss it.

Satin Noland, the thirteen-year-old daughter of appellant and the victim, testified that she was eleven years old at the time of the incident. The victim stated that her friend, Rosalyn Murdock, was at her house the night of the incident.

Satin testified that she "doubt[ed]" that her parents' arguing awakened her during the night of the incident. She stated that she did not hear anyone talking while she and Rosalyn[2] were sleeping, "unless it was the TV." She was unsure of whether she heard appellant and the victim arguing. Satin testified that she did not recall telling Sergeant David Sloan that the arguing of the victim and appellant awakened her, that she saw appellant grab a kitchen knife and threaten the victim, or that appellant handcuffed the victim and put tape on the victim's mouth. She also did not remember telling him that she grabbed a baseball bat and went into the kitchen to help the victim but was afraid to use the bat because she thought appellant would use it on the victim.

Satin testified that she did not recall going across the street with Rosalyn to use a neighbor's phone. She stated that she did not remember calling 9-1-1 and telling the police that appellant had handcuffed the victim, put black tape on the victim's mouth, and taken her away in a vehicle. Satin likewise stated that she did not remember telling her neighbors that appellant had handcuffed the victim and put her in the vehicle. When asked why they were in court that week, Satin answered, "To bring my dad home," and she stated that she wanted her father to come home.

Rosalyn testified that she recalled spending the night at Satin's house back in 2008, when they were eleven years old. She and Satin went to sleep around 10:00 or 11:00 p.m. Rosalyn said appellant and Satin were "fussing" in the den, and they awakened her. She

[2] Rosalyn Murdock's mother, Brenda Murdock, also testified at the trial. Because they share the same surname, we will refer to the minor witness by her first name to avoid confusion. In doing so, we intend no disrespect.

recalled that appellant was cussing, and Satin said, "'Get my mom out of the trunk.'" Rosalyn stated that Satin sounded frightened. She said she never heard the victim's voice.

Rosalyn testified that Satin returned to her bedroom crying. She said Satin looked afraid and told her that appellant "ha[d] her mom." Rosalyn and Satin looked out of the window and saw the victim's vehicle backing out of the driveway. Rosalyn could not see who was inside the vehicle.

Rosalyn and Satin went across the street to the neighbors' house for help. The neighbors answered the door, and Rosalyn and Satin went inside. Rosalyn and Satin told the neighbors what had happened. Rosalyn recalled being afraid and upset when she was at the neighbors' house and said Satin was also scared. Rosalyn testified that Satin called the police from her neighbors' home. According to Rosalyn, while they were at the neighbors' house, Satin saw appellant through the neighbors' window. Rosalyn said appellant was calling Satin's name, and Satin asked the neighbors not to tell appellant that she and Rosalyn were in their home.

Rosalyn stated that the police arrived at the neighbors' home and told her and Satin to stay there. Rosalyn said the victim returned "some hours" after they went to the neighbors' house, and the victim did not look like herself. Rosalyn returned to the victim's home once the police were there. The police called Rosalyn's mother, who arrived shortly afterwards.

On cross-examination, Rosalyn testified that she only saw Satin leaving the room the night of the incident. Rosalyn did not leave the room and did not know what was occurring in the den. Rosalyn said she was afraid that night because of Satin's reaction, but she never saw appellant do anything.

William Pegues testified that the victim and her children were his neighbors across the street. Mr. Pegues was at home sleeping on the couch during the early morning hours of September 1, 2008. His wife, Betty Johnson Pegues, was also at home, sleeping in their bedroom. Mr. Pegues stated that Satin and "her little friend" rang his doorbell between 2:00 and 3:00 a.m. and asked to use his phone. He testified that Satin said, "Can I use your phone? My mother and father are gone, and I don't know where they went." Mr. Pegues allowed Satin and Rosalyn inside his home, and Satin used the phone. Satin asked Mr. Pegues if he would get C.J., who was still at the victim's home. Mr. Pegues went across the street, awakened C.J., and brought him to his house.

When Mr. Pegues returned to his house, he discovered that Satin had called 9-1-1. The 9-1-1 operator had called the Pegues' number back, which awakened Mrs. Pegues. The

police arrived at the Pegues' home, and Satin told the police what had happened. Mr. Pegues heard Satin tell the police, "My mom and daddy got to fighting, and he put her in the trunk of the car."

Betty Johnson Pegues testified that during the early morning hours of September 1, 2008, a message on her answering machine left by the police department dispatcher awakened her. The dispatcher stated that they were sending a police vehicle to her home. When she heard the message, she arose, went into the den, and asked Mr. Pegues why the police were coming to their home.

Mrs. Pegues asked Satin what happened, and Satin told her that "her daddy had handcuffed her mother and threw her in the trunk of the car." Mrs. Pegues testified that she heard Satin tell the police that the victim had moved on with her life and that appellant was upset with the victim for doing so. Mrs. Pegues told Rosalyn to call her mother to let her know what was happening. Rosalyn's parents came to the Pegues' house.

The Pegues, Rosalyn's parents, and the children went outside and stood in front of the victim's home. Appellant and the victim eventually returned, and the victim got out of the vehicle. Mrs. Pegues stated that the victim's face "was all bruised up," and she had a "great big knot on her head." The victim was not handcuffed when Mrs. Pegues saw her. She said the victim asked for her children but did not say much else. On cross-examination, Mrs. Pegues testified that she did not know how the victim's face was bruised.

Brenda Murdock testified that Rosalyn is her daughter. She recalled that Rosalyn was spending the night with Satin on August 31, 2008. Around 3:00 a.m. on September 1st, a telephone call from a police officer awakened her. The police officer advised her that Satin's parents had gotten into a fight and that she needed to come and get Rosalyn.

Ms. Murdock stated that when she arrived at the victim's home, Rosalyn was afraid, hysterical, and wanted to go home. She further stated that Satin was afraid, hysterical, and would not leave her side. Satin told Ms. Murdock that "her dad had handcuffed her mom and put tape over her mouth and put her in the trunk of the car." Satin also told Ms. Murdock that if she had a knife, she would have killed her father. Rosalyn told Ms. Murdock that Satin "was so upset because her dad was harping at her while he was beating on her mom, and he was cursing her[.]"

Ms. Murdock said she was standing outside in the victim's carport when the police brought the victim back. She stated that the victim was handcuffed and that her face was bloody and "unbelievable." She said the victim's face was swollen and bruised. The victim's shirt had blood and dirt all over it. Ms. Murdock testified that the victim was

hysterical and "not herself." She said the victim was "out of her mind" and begged her, "'Ms. Murdock, please, please, don't let Rosalyn stop playing with Satin. Please. This will never happen no [sic] more. Please. Please.'" The police officer who brought the victim home found the key to the handcuffs appellant had placed on the victim and unlocked them.

Ms. Murdock stayed with Satin, Rosalyn, and C.J. while the victim went to the police station. Ms. Murdock said Satin and Rosalyn "were so upset, they kept running to the door; and if they heard a little noise, they would not go out [of] the room." She stated that Rosalyn and Satin were afraid, stayed by her side, and did not go back to sleep. Ms. Murdock testified that the victim "seemed like she was just out of her mind" and confused when she returned from the police station.

Ms. Murdock testified that she spoke with the victim after the victim returned from the police station. The victim told Ms. Murdock that she was in bed getting ready to go to sleep when appellant came into her room and began arguing with her. The victim told appellant that she did not want to fight, and appellant began "beating on her." The victim said she attempted to get away from appellant, but he put her arms behind her back and handcuffed her. The victim also told Ms. Murdock that appellant put her in the trunk of the vehicle, pushed her out of the vehicle, and told her that he was going to kill her.

Officer Matthew Carragher with the Memphis Police Department testified that around 3:00 a.m., he answered a call at the victim's home. When he arrived, he went to the Pegues' home and spoke with Satin. Officer Carragher asked Satin what had happened, and she told him she saw appellant handcuff the victim, put black tape cross the victim's mouth, throw the victim into the trunk of the victim's vehicle, and drive away. Officer Carragher obtained a description of the vehicle and the vehicle's license plate number, which he broadcast over his police radio.

Officer Carragher patrolled the area and observed the victim's vehicle near the victim's home. He followed the vehicle, which stopped outside of the victim's home. Appellant was driving the vehicle, and the victim was in the front passenger seat. Officer Carragher testified that the victim was wearing a T-shirt that had "red splotches" on it and had her hands behind her back. When the victim exited the vehicle, Officer Carragher discovered that she was still handcuffed. Officer Carragher stated that other officers who arrived at the scene attempted to unlock the handcuffs with their own handcuff keys but were unsuccessful.

Officer Carragher testified that he spoke with the victim, and she "appeared to be in a state of shock. Her eyes were wide. She appeared to be slightly disoriented." Officer Carragher stated that he noticed a "very large bump" on the victim's forehead and blood on

her face. The victim told Officer Carragher that she had gotten into an argument with appellant inside the house. The argument became heated, and appellant brandished a knife. Appellant handcuffed the victim behind her back, put tape across her mouth, and forced her into the trunk of the vehicle. The victim further told him that appellant drove her to a secluded area, removed her from the vehicle, punched her several times in the face, and told her he was going to kill her. Appellant then placed the victim in the front passenger seat of the vehicle and drove her back home.

Officer Carragher called an ambulance to the scene. After paramedics treated the victim, Officer Carragher drove her to the felony response office so she could give her statement. While she was giving her statement, Officer Carragher tagged her bloody t-shirt and the handcuffs as evidence.

Officer Sammy Batts with the Memphis Police Department testified that when he arrived at the scene, he went across the street to the Pegues' home where he met Satin. He stated that Satin told him and another officer what had happened. Satin told the officers that appellant and the victim were in a dark blue Honda vehicle. Using that information, the officers found the license plate number for the vehicle.

Officer Batts stated that Major Joe Oakley, a supervisor at the Memphis Police Department, advised the officers on the scene that another officer spotted a vehicle with registration tags belonging to the victim. That officer told Major Oakley the vehicle was traveling toward the victim's home, and the officers initiated a traffic stop of the vehicle outside of the victim's home.

After the officers stopped the vehicle, they removed appellant and the victim from the vehicle. Officer Batts noticed that the victim was handcuffed, had bruises on her face, and there appeared to be blood stains on her shirt. The officers detained appellant and attempted to remove the handcuffs from the victim using their handcuff keys. They were initially unsuccessful in removing the handcuffs, but an officer eventually found the key inside the victim's home.

Major Oakley testified that he responded to Satin's 9-1-1 call during the early morning hours of September 1, 2008. He stated that his shift lieutenant "advised [him] that a female had been kidnapped and thrown into the trunk of a car and taken away, and this occurred in front of some small children." Major Oakley went to the scene, assessed the situation, and called the duty commander to advise him of the situation.

Major Oakley stated that he saw the suspect vehicle when he was leaving the scene, and he attempted to initiate a traffic stop. The suspect vehicle sped away, and Major Oakley

followed it. The vehicle stopped on Mingle Drive, a few houses down from the victim's home.

Major Oakley stated that appellant jumped out of the vehicle when it stopped. He ordered appellant to show his hands and get on the ground, and appellant complied. Another officer who was on the scene handcuffed appellant and placed him in the backseat of a police vehicle. Major Oakley saw the victim and said her face was bruised, swollen, and she apparently had been beaten. He further said the victim's hands were handcuffed behind her back. Major Oakley stated that officers removed the victim from the front seat, took her into her house, and called paramedics to examine her.

Sergeant David Sloan, an investigative sergeant with the Memphis Police Department sex crimes unit, testified that his supervisor, Lieutenant Toll[3], briefed him about the incident in this case. Lieutenant Toll advised him about "a possible domestic situation where a female had been abducted. The victim was still outstanding, along with the suspect." Lieutenant Toll further advised Sergeant Sloan that two children at the scene could provide information about what happened. Lieutenant Toll instructed Sergeant Sloan to go to the scene and take photographs so the police could do a "city watch." He explained that city watches were "kind of a mini [A]mber alert" that the police used in cases of missing or endangered people and life-threatening kidnapping cases.

Sergeant Sloan testified that he spoke with Satin when he arrived at the scene. He said she was upset, and he could tell she had been crying. Satin told Sergeant Sloan that

> she had a friend spending the night. She said that she was asleep in her bed, and she heard a loud fight. She got up to see what was going on, and she saw her father, [appellant]." She said she couldn't see her mom at first, and he refused to let her see the mother and said everything was okay. She said she knew they had been fighting because she could hear the sounds of a fight. She got so scared, she went back to her room and obtained a bat that she said she was possibly going to use to get her dad off of her mother. She said she became frightened that her dad would actually take the bat from her and maybe use it on her mother, so she said she never brought it towards him.

> She said a few minutes later, she saw her mom [and] it looked like she had been . . . beaten. She saw her father put handcuffs on her mother and then run duct tape around her mouth and to the back of her head. She said her father took her mother to [the victim's] car, which was parked outside and put

---

[3] Lieutenant Toll's first name is not included in the record.

her in the trunk. She also said that at one point, before he handcuffed and . . . . taped her, . . . he had obtained a kitchen knife, and she was afraid that he would stab her mother.

She said after the incident, she and her friend that was spending the night ran across the street to [her] neighbors' house. They told them what was going on, and they called the police.

While her and her friend were across the street, she said her father actually came back to the scene and yelled for her to come out and get in the car. She said she was scared. She refused to come out of the neighbors' house, and her father drove off.

Sergeant Sloan testified that he also spoke with Rosalyn at the scene. Sergeant Sloan said Rosalyn told him that she was sleeping and heard Satin's parents fighting. He said Rosalyn "basically relayed the same information" as Satin. However, Rosalyn did not go into detail about Satin's obtaining a bat or appellant's having a kitchen knife.

Sergeant Sloan heard sirens during his interviews with Satin and Rosalyn and went outside. Once outside, he observed several police vehicles following a vehicle. When the vehicle stopped, police officers "swarmed the vehicle" and pulled the driver out of it. Sergeant Sloan approached the vehicle and saw the victim sitting in the passenger seat of the vehicle at an angle with her hands handcuffed behind her back.

Sergeant Sloan stated that the victim was wearing a light-colored t-shirt that had blood on it. The victim wanted to change clothes, but the officers advised her that the paramedics needed to examine her before she did so. Sergeant Sloan told her that the police would need the shirt that she was wearing for evidence. Sergeant Sloan stated that the victim "had obvious signs of a beating," including pronounced swelling under both eyes.

Sergeant Sloan testified that the victim was in a state of shock. He said she was quiet and seemed embarrassed about what happened and the police officers' presence at her home. The victim told Sergeant Sloan that she did not want to prosecute appellant. Sergeant Sloan explained to the victim that she had to speak with the police because of the seriousness of the crime and because she was obviously the victim of a beating. He further explained that she did not have to prosecute if she did not wish, but the State would prosecute because it felt strongly about domestic violence incidents.

Sergeant Sloan obtained a brief oral statement from the victim in which she told him that she and appellant had dated for thirteen years. They ended their relationship

approximately three months before the incident but were trying to reconcile. Appellant went to the victim's house, and they got into a verbal argument that escalated to appellant's hitting her. The victim told Sergeant Sloan that she felt threatened because appellant obtained a kitchen knife. Appellant handcuffed the victim, taped her mouth, put her in the trunk of her vehicle, and drove her away from her house. At some point, appellant removed the victim from the trunk and placed her inside the vehicle. Appellant choked and hit the victim. The victim told Sergeant Sloan that she began agreeing with some things appellant said about their reconciliation. Appellant then calmed down, told the victim, "You're not worth it," and began driving back toward the victim's house.

Sergeant Sloan testified that he interviewed the victim further at the felony response office. Sergeant Sloan said he asked the victim to tell him everything that happened before, during, and after the incident. The victim never told Sergeant Sloan that she fell down. Sergeant Sloan asked the victim if appellant threatened to kill her, and the victim responded, "Yes." After the victim gave her statement, Sergeant Sloan photographed her injuries.

Mike Triplett with the Shelby County General Sessions Criminal Court Clerk's Office testified that appellant had a case in general sessions court from his arrest for this incident. Appellant's file contained an order granting appellant bond. That order prohibited appellant from threatening to commit, attempting to commit, or committing domestic assault; assault; vandalism; false imprisonment; stalking; harassment; or a violation of any order of protection or restraining order as prohibited by the courts against the victim or any other family household member. The order also prohibited appellant from "harassing, annoying, telephoning, contacting, or otherwise talking with, the alleged victim, either directly or indirectly." Moreover, the order directed appellant "to vacate or avoid the home of the alleged victim and to avoid any other location where the victim is likely to be." Finally, the order prohibited appellant from using or possessing a firearm or other weapons specified by the court and prohibited appellant from possessing or consuming alcohol or controlled substances. Appellant agreed to the bond requirements reflected in the order, and the court set his bond at $50,000.

Constance Williams, a fingerprint technician in the criminal history records and identification division at the Shelby County jail, testified that each inmate who entered the jail was given a Records and Identification ("R&I") number. Each time a person goes to jail, they are fingerprinted, and their fingerprints are verified to the R&I number. She said each inmate has their own R&I number, and no inmate has more than one R&I number. Ms. Williams fingerprinted appellant, compared appellant's fingerprints with R&I numbers on file, and retrieved appellant's R&I number.

Juaquatta Harris testified that she worked for the Shelby County Sheriff's office recording telephone calls made by inmates and explained the process for recording telephone calls. Ms. Harris stated that all telephone calls are recorded; however, the calls are not downloaded unless someone requests it. Ms. Harris stated that she downloaded 243 recorded telephone calls for appellant's R&I number made between September 1, 2008, and the early part of 2009. Ms. Harris said she listened to some of the recorded calls that belonged to appellant's R&I number. Appellant made a couple of calls during the intake process, which she also downloaded.

The State played appellant's recorded telephone calls for the jury, and they are a part of the record on appeal.

Derek Whitlock, a third-year law student at the University of Memphis, testified that he interned with the district attorney's office the summer before appellant's trial. During his internship, the district attorney's office asked him to listen to recorded telephone conversations concerning the investigation of appellant's case. He identified a compact disc containing the telephone calls. He could not remember the exact number of telephone calls on the compact disc but said he "would safely say . . . well over two hundred."

Mr. Whitlock testified that he listened to all of the calls. He listened to approximately 90-95% of the conversations contained on each call. He stated that most of these telephone conversations were between appellant and the victim, and he became familiar with appellant's voice and the victim's voice while listening to the telephone calls. He said they were three-way telephone calls, and appellant would tell the other person on the telephone to call the victim's cellular phone or place of employment to reach her. According to Mr. Whitlock, if the victim did not answer appellant's call, appellant "would either talk briefly with the family member that he was on the phone with originally in the conversation[] or continue the conversation with the first person and then make continued attempts at reaching [the victim]." He said appellant was "very persistent" in his attempts to reach the victim. Mr. Whitlock outlined approximately thirty telephone calls that were pertinent to the witness tampering and aggravated stalking investigation.

On cross-examination, Mr. Whitlock testified that although he only outlined thirty calls that were useful to the investigation, he did not agree that most of the calls had nothing to do with the investigation. He said he did not outline all of the calls because his supervisors "did not want to inundate the jury with hundreds of hours of phone calls." Mr. Whitlock agreed that appellant and the victim discussed their children, their relationship, and "family stuff'" during some telephone conversations. On redirect examination, Mr. Whitlock clarified that the telephone calls he isolated were not the only ones in which appellant and

the victim talked about this case. He estimated that appellant and the victim discussed the case in at least 99% of the telephone calls.

Appellant chose to testify in his own defense. He stated that he had been in a relationship with the victim for thirteen years. During that time, he lived with the victim, Satin, and C.J. At the time of the incident, he had been employed as a security guard for approximately five months. He said he had moved back into the victim's home the day of the incident with the understanding that he and the victim were going to reconcile.

Appellant denied kidnapping the victim. He stated that they argued at their home and went "somewhere." He further stated that it was the victim's idea to leave, and he did not force her to go. When asked whether he had a weapon during the incident, appellant answered, "I moved the weapon."

Regarding the events on August 31, 2008, appellant stated that the victim left her home around 12:45 p.m. When she returned around 1:00 a.m., appellant was on the couch watching television, and the children were asleep. Appellant said he had been calling the victim all day, and she did not answer his calls, which was unusual. When the victim returned home, she said, "Hey," to appellant. Appellant ignored her, and the victim went to her room, undressed, and got into the bed.

Appellant testified that he went into the victim's room and asked her why she did not answer his telephone calls. The victim replied, "Well, I don't have to tell you nothing [sic]." The victim further told appellant, "I'm grown. I don't have to tell you nothing [sic]. You're not my dad[.]" Appellant and the victim began arguing. Appellant told the victim that he was worried about her because she did not answer or return his calls. They continued to argue, and appellant told the victim, "I see that this was a big mistake for me even coming back over here - even moving back in trying to work on things because I see right now that you don't want to work on things." He told the victim that when he left, he was leaving for good.

Appellant said he went back into the living and watched television for a little while. He then went back into the victim's room and asked her where she had been. The victim told him she had been out drinking with friends. Appellant asked the victim with whom she had been, and the victim answered, "None of your business." Appellant stated that he knew the victim was seeing someone else. He said that was a problem for him because if the victim was "going to try to be doing it like that, then [she] should [have] never invited [him] to move back in . . . ." Appellant told the victim that he did not have time to play games, and if she wanted to part ways, he was fine with it. He further warned the victim not to use their

-15-

children as an excuse to get him to come back home after he left. Appellant told the victim he was done with the relationship and began packing his clothes.

Appellant stated that the argument escalated. He and the victim called each other names, and the victim told him to leave because she had another boyfriend. Appellant testified that he was hurt when the victim told him that she was dating someone else. The victim asked appellant where he was going to stay, and appellant answered, "Look here, I'm sleeping with your sister. I got her pregnant, and that's where I'm fixing to move to." Appellant stated that he, in fact, was not sleeping with the victim's sister and did not get her pregnant. He explained that he said those things because he wanted the victim to "feel the same pain [he] felt." He stated that he said this as he was walking out of the victim's room. When he returned, the victim rose and asked him what he said. Appellant repeated what he said, and the victim hit him in the nose. He stated that his nose began bleeding, and he "clicked." Appellant hit the victim, and they began fighting in the bedroom.

Appellant testified that the victim kept a knife in her night stand for protection. After appellant hit the victim, the victim grabbed the knife and said, "MF, you just hit me." The victim went toward appellant with the knife. Appellant grabbed the victim's arm from behind and told her to calm herself. Appellant stated that he was "kind of smiling" because what he said hurt the victim, but he did not know the argument would get to that point. Appellant and the victim wrestled each other for the knife. Appellant said his main concern was preventing either of them from falling on the knife. Appellant had his hand on the back of the victim's neck because "if you secure a person's neck or their head, then you control their whole body." He stated that the victim had scratches on her neck because he was trying to hold her down and take the knife. Appellant pinned the victim down on the floor. He said the pattern left on the victim's face was from her being on the rug in the bedroom. Appellant said he applied "a lot of pressure on [the victim's head and neck] for her to drop the knife." Appellant kicked the knife out of the way after the victim dropped it and handcuffed the victim. He stated that he intended to leave the victim handcuffed until he could get the rest of his belongings from the victim's home.

After appellant handcuffed the victim, he picked her up and retrieved the knife. According to appellant, he was going to take the knife to the kitchen. He and the victim then walked down the hallway. As they were walking down the hallway, Satin opened the door to her bedroom and asked appellant what was happening. Appellant told her that nothing was wrong and everything was "cool." Satin told appellant she had heard him and the victim arguing and again asked what was happening. Again, appellant told her that everything was fine. Appellant said the victim was walking in front of him. He denied pushing or guiding the victim as they walked. He said he held the knife to his side as they walked down the

hallway. He denied threatening the victim with the knife. He further denied brandishing the knife and said he never touched the victim with it.

Appellant stated that the victim walked into the living room and sat down. Appellant told the victim to "just be cool," and went to put the knife in the kitchen. He stated that the victim was in shock and cursing at him. He told the victim that she deserved for him to hit her just as he deserved her hitting him. He further told the victim, "If you're woman enough to hit me like that, you should be woman enough to take a hit."

Appellant stated that the victim followed him as he gathered his belongings, and she asked him to remove the handcuffs. Appellant told her that he was not going to remove the handcuffs until he retrieved all of his belongings because she might try to get the knife again. He said the victim continued to "holler and cuss" at him. Appellant told the victim to "shut up" before she awakened the children. Appellant said he "playingly [sic]" told the victim, "Look you need to get out of my face . . . because your breath smells like alcohol," and he put tape over her mouth. Appellant testified that the tape was "half way on and half way off," but the victim could not remove it because he had handcuffed her.

Appellant further testified that the victim suggested they take their argument outside. Appellant ignored the victim and continued bringing his belongings to the vehicle. The victim followed appellant outside and asked him to take the tape off her mouth. Appellant said the victim fell by her vehicle. He picked her up, apologized for hurting her, and told her to sit down. The victim told appellant that her head was hurting, and appellant told her that he would remove the handcuffs. Appellant looked in his bag for the key to the handcuffs but could not find it. He said the victim was squirming, which caused the handcuffs to tighten. Appellant had a spare key for the handcuffs at his sister's house across town. Appellant told the victim they had to go to his sister's house and get the key to remove the handcuffs.

Appellant stated that he and the victim left to go to his sister's house, which was approximately fifteen minutes away, but the vehicle did not have enough gas to make it there. They were near a police precinct, and appellant drove the vehicle into the precinct's parking lot. Appellant told the victim they could not make it to his sister's house because the vehicle was low on gas. He and the victim began talking, and he turned off the vehicle's ignition. The victim told him she did not want to talk because the handcuffs were hurting her. Appellant suggested that they go back to the victim's home and look for the key, and the victim agreed.

Appellant testified that he and the victim were unable to turn onto the victim's street because police vehicles had blocked it. Appellant turned the vehicle around and went a different route. When they turned onto the victim's street, a police officer initiated a traffic

stop. The officer advised appellant that they were investigating a possible kidnapping. According to appellant, the victim told the officer that they must have been mistaken. Police officers pulled appellant from the vehicle and told him to get on the ground. A police officer removed the victim from the vehicle and took her away.

Appellant denied ever putting the victim in the trunk. He stated that Satin testified that he put the victim in the trunk because she had asked him, "Dad, where is my mom?," and he replied, "She['s] in the trunk. Okay. Is that what you want to hear?" Satin told appellant to stop playing. He replied, "No," and told her they would be right back.

Regarding the telephone calls to the victim, appellant testified that he called his sister after he was booked so that she could make a three-way call to the victim. Appellant said he wanted to see if the victim was okay. Appellant was placed in jail, but he was released when the victim bonded him out. Appellant went to his sister's house after his release from jail and never returned to the victim's home.

Appellant agreed that he continually called the victim but denied he was stalking her. He said he occasionally tried to find out what the victim was doing or where she had been but stated that he primarily called the victim regarding their children. Appellant was concerned because he had never been in trouble or in jail before.

Appellant stated that during his relationship with the victim, each of them would often tell the other not to call anymore. However, he explained that it did not mean that the other person was never to call again. Rather, it meant that the other person was getting on their nerves. Appellant further explained that he told the victim what she needed to do in order to help him get out of jail in some of the telephone calls because other inmates told him that he was facing sixty years in prison, and he was afraid of being in jail. He said he told the victim, "You know . . . that I didn't kidnap you," several times. He admitted that it sounded like he was telling her to testify falsely but said he was actually telling her not to do so. According to appellant, the victim told him that prosecutors were calling her and threatening to "lock [her] up" if she did not testify according to her statement to police. Appellant said the victim never stated that appellant threw her in the trunk of the vehicle, and he advised her not to lie and say he did.

Appellant denied forcing the victim into and out of the vehicle. He said the victim was calm, and he and she were talking when they returned to her home. Appellant was present when the victim made statements to the police at the scene and denied that she appeared to be hysterical. He did not hear the victim state that appellant hit her but admitted that he did not hear all of her statements to police.

-18-

Appellant denied threatening to harm the victim in any way. He also denied that he promised her anything of value if she helped him. He said he only told the victim, "You can get back [at me] in any kind of way you want to. . . . But this right here is not a game." He asked the victim not to "lie on [him]" to get him back for their fight.

Appellant admitted he told the victim not to appear in court during some of the telephone calls. He explained that he was "ignorant to the facts of the system," and his lawyer[4] told him his case would "go away" if the victim did not appear in court. According to appellant, his lawyer advised him to tell the victim to not appear in court. Appellant said he told the lawyer that the State threatened to send the victim to jail if she did not appear in court or if she testified contrary to her statement. He further said the State threatened to call the Department of Children's Services and take their children if the victim did not appear in court. Appellant stated that his main concern was keeping the victim from going to jail so he told her, "Well, . . . don't put yourself in no [sic] position to go to jail . . . ."

Appellant testified that before he was released from jail, he signed an order that set certain bail conditions. He stated that he did not read the document thoroughly before signing it. Appellant stated that the order prohibited him from contacting the victim, including telephoning her. Appellant denied calling the victim to harass, threaten, or promise her anything. He said he called the victim because they have children together and because he loved the victim and wanted a friendship with her.

According to appellant, Satin did not see him strike the victim or take the victim outside. He said Satin did not go outside and did not see him and the victim when they went outside. He also said the farthest Satin went was to the screen door, but she did not open it. When Satin was at the screen door, the victim was already inside the vehicle. Appellant stated that the victim's vehicle had tinted windows, and no one could see inside it, especially at night.

On cross-examination, appellant testified that he drove four blocks during the two hours that he and the victim were gone. He said during that time they stopped and talked. Appellant stated that during direct examination, he incorrectly testified that he had never been in jail. Appellant admitted that he had been in jail before this incident.

Appellant agreed that he testified on direct examination that things had never gone that far between him and the victim. However, he recalled that on June 24, 2007, police officer Rodney Wilkinson responded to the victim's home. Appellant denied that he had

---

[4] Appellant was referring to a lawyer with whom he spoke but apparently did not retain. This lawyer did not represent appellant at trial.

slapped the victim at the casino the night before Officer Wilkinson responded and further denied that he slapped her again when he went to her home to retrieve his clothing after the casino incident. He denied saying that he "beat the sh[] out of the victim" in Officer Wilkinson's presence. Based on that incident, a police officer arrested appellant for domestic violence and assault, and appellant went to jail.

Appellant testified that when he said he wanted to hurt the victim, he meant that he wanted to hurt her mentally, not physically. Appellant denied that the fight with the victim related to sex. Appellant stated that he did not remember telling his first lawyer that he had the handcuffs for sexual reasons or telling the victim that she could tell the prosecution that the incident was a "kinky" sex act. When asked if he heard his voice saying these things on the recording played for the jury, appellant again said he did not remember. He later testified that he was being untruthful when he initially said the incident involved "kinky" sex.

Appellant stated that he graduated high school and attended one year of college. However, appellant said he could barely read and write. Appellant equivocated from his previous testimony and testified that he was unaware that he was not supposed to contact the victim after he was released from jail. Appellant maintained that he did not want the victim to go to jail and said that was one reason he called her more than 200 times, although the order prohibited him from doing so.

Appellant agreed that he said he "messed up" the victim's face during a recorded conversation, but he insisted that the incident began as a prank and "[b]asically" turned into an "a[] whooping." Appellant denied hitting the victim while she was handcuffed. Appellant did not recall saying Satin witnessed the beating of the victim. Appellant said Satin did not witness it, and he lied in the "jailhouse recording" when he said she witnessed it. Appellant testified that on the same recording in which he said Satin witnessed the attack, he also said something "got into [him], and [he] just clicked." Appellant agreed that he blamed the devil and stated he had never been like that before.

Appellant further agreed that he told Satin to tell Rosalyn not to appear in court. He also told the victim to hide and dodge the people who were going to serve her with a subpoena and to tell the prosecutor's office that she no longer lived in Memphis.

Appellant recalled writing a letter to Judge Lee V. Coffee in Division VII of the Shelby County Criminal Court. In that letter, appellant told Judge Coffee that he "left out, out of town for a job interview only to come home and find my fiancé [sic] there with another man." He further wrote, "Your Honor, I admit my fiancé [sic] and I have argued in the past, but nothing to this extent. Long story, short, I did put my hands on her but only to defend myself." Appellant wrote in the letter to Judge Coffee that he handcuffed the victim and

"threatened to take her to the police precinct due to a citizen's arrest for her continually trying to stab [him]." He did not tell Judge Coffee that he left with the victim to find the keys to the handcuffs and said he did not think that including that information at the time was important.

Appellant testified that he drank approximately four beers during the day on August 31, 2008. Appellant did not recall stating during a recorded conversation that he had "taken something" he had never taken before and said he did not use drugs. He further denied saying that he had overdosed on Xanax and two Ecstasy pills, although his statement saying such was recorded. The State played the recording for appellant. Appellant then admitted that he told the victim that he had taken Xanax and Ecstasy but said he lied to the victim.

Appellant admitted saying he was going kill the victim and then himself because he could not take it anymore. He recalled saying that his "mission was for [the victim] to go and for [him] to go after," but he later equivocated and testified that was not his plan.

Appellant testified that he did not think "jokingly" telling Satin that her mother was in the trunk was an appropriate thing to say to an eleven-year-old child. He agreed that it was twice as bad for a father to tell his daughter that her mother was in the trunk of a vehicle. Appellant stated that he was angry and disappointed with Satin because she called the police. He said Satin did not obey his orders, and when he tells someone to do something, he means for people to follow his instructions to the letter. Appellant admitted telling the victim to advise Satin to say that she did not remember anything about that night because she was a child. He further admitted if Satin had said that, it would have been untrue. Appellant explained that the State told Satin she could not change her statement and say she thought appellant did something that he did not actually do.

Officer Rodney Wilkinson testified on rebuttal for the State that on June 24, 2007, he responded to a domestic disturbance call at the victim's home. Appellant was the suspect involved in that call. Officer Wilkinson spoke with appellant at the scene, and appellant told him, "'I beat the sh[] out of her.'" Officer Wilkinson arrested appellant and transported him to jail. He further stated on redirect examination that he remembered appellant because "[appellant] said something no one else - I mean rarely ever said."

After hearing the evidence, the jury acquitted appellant of aggravated assault in case 09-00015. The jury also acquitted him of especially aggravated kidnapping but convicted him of the lesser-included offense of false imprisonment. The jury convicted appellant as charged for domestic assault. In case number 10-04036, the jury acquitted appellant of one count of bribery of a witness and one count of coercion of a witness but found him guilty as charged on the remaining counts.

The trial court sentenced appellant to consecutive eleven-month and twenty-nine-day sentences for his false imprisonment and domestic assault convictions in case number 09-00015. In case number 10-04036, the court sentenced him to six years for bribery of a witness, four years for each count of coercion of a witness, and two years for aggravated stalking. The trial court ordered that he serve his sentences consecutively in incarceration, for a total effective sentence of eighteen years. Appellant filed a motion for new trial, which the trial court denied, resulting in the instant appeal.

III. Analysis

A. Sufficiency

Appellant argues that the evidence was insufficient to support his convictions for aggravated stalking, bribery of a witness, and false imprisonment[5]. He contends that (1) the trial court and State "erroneously represented a pure objective standard in [the stalking statute] despite the clear and unambiguous language indicating otherwise"; (2) he never offered anything of value to the victim to support the bribery of a witness conviction; and (3) "any action[s] taken by [a]ppellant for the purpose of subduing [the victim] during this situation were justified and proportional to the threatened risk." The State responds that the evidence is "more than sufficient" to support appellant's convictions. We agree with the State.

The standard for appellate review of a claim of insufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

---

[5] On appeal, appellant only challenges the sufficiency of the evidence for his convictions of aggravated stalking, bribery of a witness, and false imprisonment. Accordingly, any challenge to the sufficiency of the evidence supporting his other convictions is hereby waived. *See* Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review.")

On appellate review, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

### 1. Aggravated Stalking

As relevant to this case, the State had to prove that appellant intentionally engaged in stalking, and

> [a]t the time of the offense, was prohibited from making contact with the victim under a restraining order or injunction for protection, an order of protection, or any other court-imposed prohibition of conduct toward the victim or the victim's property, and the person knowingly violate[d] the injunction, order or court-imposed prohibition.

Tenn. Code Ann. § 39-17-315(c)(1)(E) (2010). "'Stalking' means a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested[.]" *Id.* § 39-17-315(a)(4).

Viewed in the light most favorable to the State, the evidence showed that the order granting appellant bail prohibited appellant from "harassing, annoying, telephoning, contacting or otherwise communicating with the victim either directly or indirectly." Appellant testified that he was aware of this condition, yet he telephoned the victim more than 200 times in violation of the order.

During one of the recorded telephone calls, appellant warned the victim, "[L]augh now, cry later." Appellant told the victim that he was not dead, indicating that she would have to face him again. The victim answered that she could have been dead, and appellant responded, "If I wanted to do that . . . trust me, it would have happened." Appellant told the victim that she was "steady pushing the anger" out of him. The victim reminded appellant that he had to stay away from her. Appellant stated, "You act like I got fifty years in the penitentiary; like I ain't never gonna get out of jail. I mean it. . . . [Y]ou know I don't play like that. I don't play games like that." Furthermore, regarding the victim's allowing their children to visit him and talk on the telephone with him, appellant stated, "You can either do it the easy way or do it the hard way." Finally, in this call, appellant said to the victim, "You're all going to have to look in my eyes again. . . . I ain't making no threats. These are promises."

Moreover, the victim's trial testimony also suggests that appellant's behavior actually caused the victim to feel harassed. The victim testified that she "really didn't want to talk to [appellant] some days." She testified that the phone calls were harassing when he wanted to talk about the trial, and she did not want to discuss it. She said she did not mind appellant's calling if he called to discuss their children. Although she agreed that appellant talked about the children often when he called, she testified that he also discussed the incident, which she did not want to talk about. Morever, many of these calls occurred while the victim was at work. On several occasions, the victim attempted to end a telephone call; however, appellant would not allow the call to end.

There was more than sufficient evidence that appellant willfully engaged in telephoning the victim more than 200 times while he was under a court order that prohibited him from contacting her. Furthermore, appellant's course of conduct involving repeated or continuing telephone calls to the victim would cause a reasonable person to feel harassed, and the victim actually felt harassed as result of appellant's actions. Thus, we conclude the evidence was sufficient to support appellant's conviction for aggravated stalking. This issue is without merit.

### 2. Bribery of a Witness

A defendant commits the offense of bribery of a witness if he or she:

(1) Offers, confers or agrees to confer anything of value upon a witness or a person the defendant believes will be called as a witness in any official proceeding with intent to:

> . . . .

-24-

(B) Induce the witness to avoid or attempt to avoid legal process summoning the witness to testify; or

(C) Induce the witness to be absent from an official proceeding to which that witness has been legally summoned[.]

Tenn. Code Ann. § 39-16-107(a)(1) (2010).

In this case, appellant called the victim frequently, asking her to avoid being summoned as a witness. During a recorded telephone call on September 27, 2008, appellant told the victim, "Do not come to court under [any] circumstances." He instructed the victim to not answer phone calls from unknown numbers because it could be the State attempting to serve her with a subpoena. After appellant asked the victim to help him by not appearing at the bond hearing, the victim asked appellant, "What am I getting out of this deal?" Appellant responded that he would be "out of the victim's hair." He promised to move to Alabama and stop "bothering" her unless it pertained to their children. He also promised that he would voluntarily pay child support for their children. Appellant told the victim that he could not benefit anyone while incarcerated and that is why he wanted the victim to not appear in court so he would be released from jail. Moreover, he also promised that he would not "bad talk" the victim or "spread [her] name" in Alabama.

Appellant claims that his conviction for bribery of witness cannot stand because he did not offer the victim anything of value. We disagree. The evidence is clear that, appellant offered to voluntarily pay child support if the victim helped him be released from jail. Moreover, while not of monetary value, appellant offered to remove himself from the victim's life if she avoided legal process summoning her to testify or did not appear in court to testify. Thus, appellant agreed to confer things of both monetary value and intrinsic value to the victim if she agreed to avoid being summoned to court. Accordingly, we conclude that the evidence was sufficient to sustain appellant's conviction for bribery of a witness.

### 3. False Imprisonment

A person "who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty" commits false imprisonment. Tenn. Code Ann. § 39-13-302(a) (2006). Here, appellant admitted that he handcuffed the victim, substantially interfering with her liberty. Moreover, the proof showed that appellant knowingly and unlawfully put the handcuffed victim in the trunk of her vehicle and drove her to a remote location. Appellant, appearing to assert a claim of self-defense, contends that he only handcuffed the victim and took her away from the home in an effort to subdue her. However, self-defense is not a defense to false imprisonment. *See* Tenn. Code Ann. § 39-11-611(2006)

-25-

Sentencing Comm'n Cmts. ("[Self-defense] is applicable to the use or threatened use of force and to both ordinary force and deadly force."). Accordingly, we conclude that the evidence was sufficient for a reasonable jury to find appellant guilty beyond a reasonable doubt of false imprisonment. Appellant is not entitled to relief on this issue.

## B. Sentencing

Appellant argues that the trial court erred in applying enhancement factors and ordering that appellant serve his sentences consecutively. Specifically, he argues that "the record clearly indicate[s] that the excessive and disproportionate sentence in this case resulted from both an inappropriate focus on a non-victim party, as well as a clear dissatisfaction with the ultimate result rendered by the jury . . . ."

### 1. Standard of Review

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b) (2010). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4) (2010).

When imposing a sentence within the appropriate range of punishment for a defendant,

> the court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1)     The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

>    (2)    The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210 (2010). From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008) (quoting Tenn. Code Ann. § 40-35-210(d)).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory minimum sentence and rendered enhancement and mitigating factors advisory only. *See* Tenn. Code Ann. §§ 40-35-114, 40-35-210(c) (2010). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. *See id*. § 40-35-210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, to ensure fair and consistent sentencing." *Id*. § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *Carter*, 254 S.W.3d at 345. The burden of proving applicable mitigating factors rests upon appellant. *State v. Mark Moore*, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Id*. at 345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

In addition, when a trial court orders a sentence involving confinement, the court should consider whether: (A) "confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct"; (B) "confinement is necessary to avoid depreciating the seriousness of the offense" or to "provide an effective deterrence to others likely to commit similar offenses"; or (C) less restrictive measures have been frequently or recently applied to defendant unsuccessfully. Tenn. Code Ann. § 40-35-103(1) (2010).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Susan Renee Bise*, ___ S.W.3d ___, No. E2011-00005-SC-R11-CD, 2012 WL 4380564, at *17 (Tenn. Sept. 26, 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will

not remove the presumption of reasonableness from its sentencing determination. *Id.* This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

## 2. Enhancement Factors

At the sentencing hearing, the trial court found that enhancement factor (1), appellant had a "previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," applied to appellant's convictions for bribery of a witness, coercion of a witness and aggravated stalking. Tenn. Code. Ann. § 40-35-114(1) (2010). The court also found that the offenses involved more than one victim and applied enhancement factor (3) to each convicted offense. *Id*. § 40-35-114(3). The trial court applied enhancement factor (5), appellant "treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense," to appellant's convictions for false imprisonment and domestic violence assault. *Id*. § 40-35-114(5). The trial court further applied enhancement number (9), appellant "possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense," to appellant's convictions for false imprisonment and domestic assault. *Id*. § 40-35-114(9). Finally, the trial court found that appellant abused a position of private trust in a manner that significantly facilitated the commission or the fulfillment of the offense and applied enhancement factor (14) to all of appellant's convictions. *Id*. § 40-35-114(14). The trial court also ordered that appellant serve his sentences consecutively to each other, finding that appellant "is a dangerous offender whose behavior indicates little or no regard for human life and that he had no hesitation about committing a crime in which the risk to human life was high. On appeal, appellant only challenges the trial court's application of enhancement factors (3), (5), and (14).

Appellant asserts that when the trial court applied enhancement factors (3) and (14), it erroneously found that Satin was a victim. The State concedes that the trial court misapplied these enhancement factors based on appellant's harm to Satin. In applying enhancement factor (3), that the offense involved more than one victim, the trial court found that Satin was a victim in this case although the State did not list her as a victim in the indictment. The trial court noted that Satin likely went through and would suffer from mental anguish for the rest of her life as a result of appellant's influencing her to lie under oath while testifying. Likewise, the trial court found that enhancement factor (14) applied

based on appellant's influencing Satin to "take the stand and lie under oath by not remembering anything." The court found that appellant "abused a position of private trust in the influence that he had upon [Satin] . . . ."

The State specifically named Jean Alice Nails as the victim in all counts in this case. "A victim is 'person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime.'" *State v. Cowan*, 46 S.W.3d 227, 235 (Tenn. Crim. App. 2000) (quoting *State v. Raines*, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994)). Thus, enhancement factors (3) and (14) could not apply to any of the offenses because Satin was not named as a victim.

Appellant also challenges the trial court's application of enhancement factor (5), that appellant treated the victim with exceptional cruelty during the commission of the offense, based on the trial court's using Satin as a victim. When applying this enhancement factor, the trial court found that appellant treated both Satin and the victim with exceptional cruelty. The trial court applied this enhancement factor to appellant's convictions for false imprisonment and domestic assault, the indictments for which names Jean Alice Nails as the victim. Although the court mentioned Satin while applying this enhancement factor, it also based its ruling on the victim's statement, which was admitted as substantive evidence during the trial.

When applying the exceptional cruelty enhancement factor, proper application requires a court to find cruelty that is over and above what is required to sustain a conviction for the offense. *State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001) (citing *State v. Embry*, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995)). Here, the victim described in her statement how appellant handcuffed her, taped her mouth, put her in the trunk of her vehicle, and drove her to a remote location where he assaulted her until she acquiesced to what he wanted. As a result of the incident, the victim's face was bloody, bruised, and swollen. Appellant's placing the handcuffs on the victim in her home to restrain her while he gathered his belongings satisfied the elements of false imprisonment. His hitting the victim while in the home satisfied the elements of domestic assault. Appellant's duct taping the victim's mouth, placing her in the trunk of the vehicle, and driving her to a remote location where he continued to beat her and threatened to kill her demonstrate cruelty that was over and above what was required to sustain convictions for false imprisonment and domestic assault. The trial court considered these facts in making its sentencing determination. We conclude the trial court properly applied this enhancement factor to appellant's convictions for false imprisonment and domestic assault. Moreover, the sentencing court is entitled to considerable latitude in misdemeanor sentencing. *State v. Johnson,* 15 S.W.3d 515, 518 (Tenn. Crim. App. 1998) (citing *State v. Troutman,* 979 S.W.2d 271, 273 (Tenn. 1998)). Appellant is not entitled to relief with respect to his misdemeanor sentences.

The trial court also found two other enhancement factors in addition to those about which appellant complains. Appellant does not challenge the trial court's finding that he had a history of criminal behavior based on his calling the victim more than two hundred times in violation of the court's order. *See* Tenn. Code. Ann. § 40-35-114(1) (2010). The trial court applied this enhancement factor to appellant's convictions for bribery of a witness, coercion of a witness and aggravated stalking. "[T]rial courts 'can consider criminal convictions or any other criminal behavior which occurred prior to the sentencing hearing as being a previous history of criminal convictions or criminal behavior under Tenn. Code Ann. § 40-35-114(1), regardless of whether the convictions or behavior occurred before or after the criminal conduct under consideration.'" *State v. Jordan*, 116 S.W.3d 8, 24 (Tenn. Crim. App. 2003) (quoting *State v. Ed Waters*, No. 01-C-01-9106-CR-00158, 1992 WL 28457, at *3 (Tenn. Crim. App., Feb. 20, 1992)). We note, however, that trial courts may not use the specific acts on which the conviction is based to support the application of enhancement factor (1). *See State v. Carico*, 968 S.W.2d 280, 287-88 (Tenn. 1998). Our review of the record reveals several phone calls made by appellant to the victim in violation of the court's order for which he was not convicted. Thus, the trial court could correctly consider those phone calls as prior criminal behavior to support application of enhancement factor (1).

The trial court, looking beyond the jury's verdict, also found that appellant had a knife during the commission of the offense. Tenn. Code. Ann. § 40-35-114(9); *see State v. Winfield,* 23 S.W.3d 279, 283 (Tenn. 2000) ("[A] sentencing court may apply an enhancement factor based on facts underlying an offense for which the defendant has been acquitted, so long as the facts have been established in the record by a preponderance of the evidence."); *State v. Jeffery B. Johnson*, No. M2010-01721-CCA-R3-CD, 2012 WL 2356553, at * 4 (Tenn. Crim. App. June 20, 2012) (citing *State v. Terence Alan Carder*, No. W2008-01450-CCA-R3-CD, 2009 WL 1871883, at * 4 (Tenn. Crim. App. June 30, 2009) ("The fact that a jury finds the defendant guilty of, or a defendant pleads guilty to, only a lesser included offense does not limit the evidence that must be considered by a trial court in determining the appropriate sentence."). Thus, the trial court had three applicable enhancement factors upon which to base appellant's sentence: enhancement factor (5) applied to appellant's convictions for domestic assault and false imprisonment; enhancement factor (9) applied to appellant's conviction for domestic assault and false imprisonment; and enhancement factor (1) applied to appellant's convictions for bribery of a witness, coercion of a witness and aggravated stalking as well as the misdemeanors. Accordingly, we conclude that the trial court did not err in enhancing appellant's sentence, and appellant is not entitled to relief on this issue.

While the trial court may have misapplied enhancement factors (3) and (14), appellant's sentence fell within the appropriate range, and the record shows that the trial

court sentenced appellant according to the statutory purposes and principles. *See Bise* at ___, * 17. Moreover, despite trial court's misapplication of enhancement factors, a reduction in appellant's sentences is not warranted because the trial court found additional enhancement factors that support appellant's sentences. Accordingly, appellant is not entitled to relief on this issue.

### 3. Consecutive Sentencing

Appellant contends that the trial court erred by ordering his sentences to run consecutively to each other. Specifically, he argues that the trial court should not have imposed consecutive sentences based on his lack of criminal history, "his previous record as a gainfully employed and productive member of society," and because he is a parent. He further posits that there was a lack of evidence to show he is a dangerous offender and that the trial court was "emotionally invested in punishing [him] as harshly as possible regardless of the applicable law or findings of the jury at trial."

The determination of whether an offender should be sentenced to consecutive or concurrent sentences is within the sound discretion of the trial court. *State v. Black*, No. M2010-02176-CCA-R3CD, 2011 WL 7562957, at * 5 (Tenn. Crim. App. Dec. 13, 2011), *appeal denied* (Tenn. May 16, 2012) (citing *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). *See Bise* at ___, * 17. Tennessee Code Annotated section 40-35-115, in relevant part, permits the trial court to order consecutive sentencing if it finds by a preponderance of the evidence that the defendant "is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4) (2006). However, "when a trial court uses the 'dangerous offender' factor, it must also decide whether consecutive sentences (1) reasonably relate to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with general principles of sentencing." *State v. Alder*, 71 S.W.3d 299, 307 (Tenn. Crim. App. 2001) (quoting *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995)).

In determining whether to order appellant to serve his sentences concurrently or consecutively, the trial court found that appellant was "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4) (2006). The trial court specifically found that appellant's bribery and coercion of the victim were "particularly troubling" because the recorded telephone calls captured appellant making threats toward the victim. Appellant told the victim to remember that he would get out of jail one day. The trial court noted appellant had engaged in a "ploy," by coercing and bribing the victim, to get the trial court to lower his bond so that he could get out of jail. The trial court found that the

-31-

"aggregate length of the sentences reasonably relate[d] to the offense for which [appellant stood] convicted based upon what [the court] believe[d] the facts of the case were, based upon what [appellant] said in his own voice. The threats that he made to [the victim.]" The court further found that it had a duty to protect the victim from appellant "at least for the next several years . . . ."

The evidence does not preponderate against the trial court's findings. The trial court considered and the record establishes that appellant, while possessing a knife, handcuffed the victim, taped her mouth, and put her in the trunk of her vehicle. Appellant then drove her to a deserted location where he hit her several times. Appellant continued to engage in criminal activity while he was in jail for the underlying offenses by calling the victim in violation of the order setting his bond.[6] This criminal activity continued after he was released on bond. Appellant called the victim more than 200 times in direct violation of his bond. During these telephone calls, appellant called the victim to coerce and bribe her into avoiding being summoned to court, not appearing in court, and testifying untruthfully. Appellant demonstrated a complete disregard of the law when he violated the court's order. Moreover, he also threatened future criminal conduct against the victim multiple times during these telephone calls. Thus, we agree with the trial court's finding that extended confinement is necessary to protect the public, specifically the victim, from appellant's further criminal conduct. *See State v. Daniel Lovell Brown*, No. 03C01-9709-CC-00410, 1998 WL 798922, at *6 (Tenn. Crim. App. Nov. 12, 1998) (affirming the trial court's finding the confinement was necessary to protect the public *and the victim* from future criminal conduct of appellant). The trial court sentenced appellant "within the appropriate range, and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *See Bise* at ___, * 17. Thus, we will not disturb appellant's sentence. Appellant is not entitled to relief on this issue.

## C. Vindictive Prosecution

Finally, appellant accuses the State of engaging in vindictive prosecution because he exercised his constitutional right to a trial by jury. He further accuses the trial court of imposing its sentencing decision in retaliation to his decision to stand trial.

---

[6] This court has noted "the irony" that the statute governing consecutive sentences expressly grants the trial court discretion to impose consecutive sentences for offenses committed while on probation and even mandates for felonies committed while on parole but does not specifically address consecutive sentencing for offenses committed during incarceration. *See State v. Sonny Wayne Smith*, No. M2009-01764-CCA-R3CD, 2011 WL 398070, at * 3 (Tenn. Crim. App. Feb. 8, 2011); *State v. Michael Blazer*, No. 03C01-9405-CR-00185, 1995 WL 45807, at *2 (Tenn. Crim. App. Feb. 3, 1995).

It is unconstitutional to punish a person for choosing to exercise his or her constitutional rights. *North Carolina v. Pearce*, 395 U.S. 711, 724 (1969) (citing *United States v. Jackson*, 390 U.S. 570, 581 (1968) *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)). Due to the severity of allegations of vindictive prosecution, *see United States v. Goodwin*, 457 U.S. 368, 373 (1982), "the Court has restricted application of the presumption of vindictiveness to situations where 'its objectives are thought most efficaciously served.'" *State v. Phipps*, 959 S.W.2d 538, 542 (Tenn. 1997) (quoting *Texas v. McCullough*, 475 U.S. 134, 138, 106 S.Ct. 976, 979, 89 L.Ed.2d 104 (1986)). If proven, allegations of prosecutorial vindictiveness or selective prosecution in the institution of a prosecution may warrant dismissal of the indictment based on constitutional concerns. *State v. Skidmore*, 15 S.W.3d 502, 508 (Tenn. Crim. App. 1999) (citing *Blackledge v. Perry*, 417 U.S. 21, 27 (1974) (due process may be implicated if a prosecutor vindictively increases a charge to a felony after a misdemeanant has invoked an appellate remedy); *Wayte v. United States*, 470 U.S. 598, 608 (1985) (equal protection standards prevent selective prosecution on the basis of race, religion, or other arbitrary classification)). However, if the prosecutor had probable cause to believe the accused committed the underlying offense, the decision to prosecute the accused rests entirely within the prosecutor's discretion, subject to certain constitutional limitations. *Id.* (citing *State v. Superior Oil, Inc.*, 875 S.W.2d 658, 660 (Tenn. 1994); *Quillen v. Crockett*, 928 S.W.2d 47, 51 (Tenn. Crim. App. 1995)).

Prior to trial, the State extended two plea offers to appellant, which appellant rejected. The State first offered appellant a sentence of 13.5 years in case number 09-00015. The State made a second offer of an eight-year sentence for aggravated kidnapping consecutive to a four-year sentence for coercion of a witness before indicting appellant in case number 10-04036. Appellant rejected this offer as well.

The State indicted appellant in case number 10-04036, and the trial court held a hearing to determine whether to consolidate the cases. During that hearing, appellant moved the trial court to dismiss case number 10-04036 for vindictive prosecution because the prosecutor told him that she would bring more indictments against him if he chose to exercise his right to a jury trial. The trial court denied appellant's motion, noting that the State was within its rights to indict him on the additional charges because they had probable cause and reasonable grounds to indict him and that appellant chose not to accept the offers knowing that the State would indict him on the additional charges. After the hearing, the State made a third offer of three years for kidnapping in case 09-00015 to be served consecutively to concurrent sentences of three years for case number 10-04036, for a total effective sentence of six years. Appellant again rejected the State's offer.

"In the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer."

*Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). "Defendants advised by competent counsel and protected by other procedural safeguards are presumptively capable of intelligent choice in response to prosecutorial persuasion, and unlikely to be driven to false self-condemnation." *Id.* (citing *Brady v. United States*, 397 U.S. 752, 758 (1970)). If a defendant rejects a plea offer, the State is entitled to prosecute that defendant to the fullest extent possible and may seek any punishment the law authorizes. *State v. Mann*, 959 S.W.2d 503, 509 (Tenn. 1997) (citations omitted).

It is undisputed that appellant was properly chargeable for bribery of a witness and coercion of a witness. We agree with the trial court's determination that the State had probable cause and reasonable grounds to indict appellant based on the recorded telephone conversations in which appellant called the victim in violation of his bond and asked her to testify falsely and avoid being subpoenaed. Thus, the State's indicting appellant for the charges in case number 10-04036 after he rejected the plea offers "no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution [and] did not violate the Due Process Clause of the Fourteenth Amendment." *Bordenkircher*, 434 U.S. at 365. Furthermore, as stated above, the trial court did not err when sentencing appellant. Appellant's assertion that the trial court imposed appellant's sentence in retaliation to his decision to stand trial is without merit. According, we conclude that the State did not engage in vindictive prosecution, and appellant is not entitled to relief on this issue.

## CONCLUSION

After careful review of the parties' briefs and the entire record, we find no error and affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE